IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION (OPELIKA)

RECEIVED

2019 APR 17 P 2: 08

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| CHARLES LINDSEY, | ) | |
| Individually, and on behalf of a class of | ) | CASE NO: |
| similarly situated individuals, | ) | 3:19-CW-00278 |
| | ) | |
| Plaintiffs, | ) | **CLASS ACTION COMPLAINT** |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| MARRIOTT INTERNATIONAL, INC. and | ) | |
| STARWOOD HOTELS & RESORTS | ) | |
| WORLDWIDE, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Charles Lindsey ("Lindsey" or "Plaintiff"), individually and on behalf of similarly situated individuals, ("the Class"), by his undersigned counsel, brings this action against Marriott International, Inc. ("Marriott") and Starwood Hotels & Resorts Worldwide, LLC ("Starwood") (collectively, "Defendants") for Defendants' failure to properly safeguard Plaintiff's personal and financial information that was entrusted to Defendants by Plaintiff. Plaintiff bases the forgoing allegations upon personal information and belief and the investigation of counsel.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Marriott International, Inc. ("Marriott") parent of Starwood Hotels & Resorts Worldwide, LLC ("Starwood") for its failure to secure and safeguard Plaintiff's, as well as hundreds of millions of Starwood's customers', personally identifiable information ("PII"), including highly sensitive information such as passport information, credit and debit card numbers, and other payment card data.

1

Starwood collected this information when customers registered on its website, checked in at any of its properties, or used its Loyalty Program.

2. In 2014 – or earlier – hackers broke into Starwood's information systems to steal confidential and sensitive guest data for hundreds of millions of customers (the "Data Breach"). The hackers continued to breach the system through September 2018, allowing the hackers access to PII of Starwood guests for more than four years.

3. Marriott discovered the Data Breach in September 2018. But, Marriott failed to notify customers about the Data Breach until three months later on November 30, 2018.

4. Defendants' negligence and careless approach to data security and protection caused one of the largest and lengthiest data breaches in history, exposing the PII and payment card information ("Payment Card Data") of hundreds of millions of consumers worldwide. Defendants' data breach spanned from 2014 to September 2018, and the PII compromised includes names, mailing addresses, phone numbers, email addresses, passport numbers, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation dates, communication preferences, and Payment Card Data, including, but not limited to, credit and debit card numbers, primary account numbers, card verification numbers, expiration dates, and zip codes.[1]

5. It comes as no surprise that hackers seek payment card information to make fraudulent purchases. Consumers bear the burden of taking affirmative actions to prevent identify

---

[1] *Marriott Announces Starwood Guest Reservation Database Security Incident,* http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last visited Apr. 14, 2019) [hereinafter Marriott Breach Announcement] (noting also that payment card numbers were allegedly encrypted, but Marriott has not been able to rule out that the information necessary to decrypt was also accessed).

2

theft and to protect their financial accounts after being victims of a data breach.

6. In the face of other high-profile data breaches, Marriott was well aware of the foreseeable threats posed by housing massive amounts of consumer data and their obligations under the law and industry standards. Additionally, even though Marriott was previously the subject of a breach in 2016, Defendants still failed to take reasonable steps to adequately protect the PII and Payment Card Data of its guests.

7. Marriott could have prevented this Data Breach with tighter security protocols. Many hotel operators fail to use the same level of security systems required by financial institutions and other highly regulated industries, even though hospitality companies, like Marriott and Starwood house sensitive personally identifiable information.

8. Marriott President and CEO Arne Sorenson admitted "[w]e fell short of what our guests deserve and what we expect of ourselves."[2]

9. The most secure information systems ensure that data is safely secured and that in the event encrypted data is inadvertently leaked, hackers cannot access the encryption keys that decrypt that same data. Defendants failed to employ these measures.

10. Marriott disregarded Plaintiff's rights by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to take available steps to prevent and stop the breach from occurring, failing to disclose the material facts about the breach, and failing to maintain adequate security practices and computer systems to safeguard PII and Payment Card Data.

---

[2] *Id.*

11. The data at issue was not kept in accordance with applicable, required, and appropriate cyber-security protocols, policies, and procedures. As a result, information was compromised and stolen, and Plaintiff and class members have suffered damages.

12. The Payment Card Industry Security Standards Council ("PCI SSC") was formed to help businesses detect, mitigate, and prevent cyberattacks and breaches. The PCI SSC's founding members—American Express, Discover Financial Services, JCB International, MasterCard, and Visa, Inc.—have established working relationships with industry associations around the country, including the American Hotel and Lodging Association, to develop security standards and programs that secure payment card data. Marriott is a "Participating Organization" in the PCI SSC.[3]

13. PCI SSC has issued standards mandating merchants to meet certain minimum data security requirements. Additionally, the Federal Trade Commission ("FTC") has issued guidance and resources for businesses to advance their data security.

14. Despite the value of the data that Marriott stored, the well-known risks of a data breach, and the PCI Data Security Standards ("PCI DSS") and FTC guidelines, Marriott failed to adequately protect its customers' personal and financial information.

15. Marriott has acknowledged that 9.1 million unique payment card numbers were involved in the breach and acquired by the hackers.[4]

16. Marriott has also acknowledged that 5.25 million unique unencrypted passport numbers and approximately 18.5 million encrypted passport numbers were involved in the data

---

[3] *See* https://www.pcisecuritystandards.org/get_involved/participating_organizations? category=&regio n=&alphaFilter=m#filterForm  (last accessed April 14, 2019).
[4] STARWOOD GUEST RESERVATION DATABASE SECURITY INCIDENT, https://answers.kroll.com (last visited Apr. 14, 2019).

breach.[5]

17. Marriott does not know if the encryption key was acquired by the hackers in the Data Breach.

18. Marriott acknowledged that payment card data was compromised. It further stated that payment card numbers were encrypted, and two components were needed to decrypt the payment card numbers, but it has not ruled out the possibility that both components were taken in the Data Breach.

19. On December 7, 2018, Visa issued a Compromised Account Management System (CAMS) alert warning that financial card information had been compromised as a result of the Marriott Data Breach.

20. Despite the well-publicized and ever-growing threat of data breaches involving payment card systems and databases, Marriott failed to ensure that it maintained adequate data security measures that could have detected and prevented the breach.

21. In addition to failing to detect or prevent the intrusion and failing to implement data security measures that would have limited the effect of a breach. Marriott exacerbated the injury by failing to notify issuers or the payment card industry of the infiltration when it supposedly learned of the breach in September 2018.

22. Had Marriott implemented reasonable data security processes and procedures— measures known and recommended by the PCI, the FTC, and data security experts— Marriott could have reasonably prevented the breach of its systems or minimized the scope and impact.

23. The injuries to Plaintiff were directly and proximately caused by Marriott's failure to

---

[5] *Id.*

implement and maintain adequate data security measures for customer information, including credit and debit card data, and personally identifiable information ("PII").

24. Plaintiff seeks to recover the costs that he and class members have been forced to bear as a direct result of the Marriott Data Breach.

25. Because the data remains stored on Defendants' systems, Plaintiff and the class have an interest in ensuring that PII and Payment Card Data are safe and are entitled to seek injunctive and other equitable relief.

## PARTIES

26. Plaintiff Charles Lindsey is a resident and citizen of Lee County, Alabama. Plaintiff currently resides in Phenix City, Alabama. Plaintiff has stayed at Marriott properties and hotels and entrusted Defendants with his PII and Payment Card Data during these times.

27. Defendant Marriott International, Inc., is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Bethesda, Maryland 20817. Marriott owns and operates the Starwood Database and is responsible for maintaining adequate data security measures over information stored on the Starwood Database, including consumers' PII and Payment Card Data.

28. Defendant Starwood is a limited liability corporation. On September 23, 2016, Marriott completed the acquisition of Starwood Hotels & Resorts Worldwide, LLC, formally known as Starwood Hotels & Resorts Worldwide, Inc., making it now an indirect, wholly-owned subsidiary of Marriott.

## JURISDICTION AND VENUE

29. This Court has subject-matter jurisdiction over this action pursuant to the Class

6

Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2), because minimal diversity exists, there are more than 100 putative class members, and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

30. This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct business in Alabama, own and operate many hotels throughout Alabama, regularly advertises through a variety of media outlets in Alabama, and has sufficient minimum contacts in Alabama. Defendants intentionally avail themselves of this jurisdiction by promoting, selling and marketing their services to Alabama consumers and entities.

31. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) & (c)(2) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

32. Defendant Marriott is a self-proclaimed global lodging leader with more than 6,700 properties across 130 countries and territories and reported revenues of more than $22 billion in the 2017 fiscal year.[6]

33. After its acquisition on September 23, 2016, Defendant Starwood became and currently remains a subsidiary of Marriott.[7]

34. Marriott is one of the world's largest hotel chain.

---

[6] About Marriot International – Find Your World, https://www.marriott.com/marriott/about marriott.mi (last visited Apr. 14, 2019).

[7] Marriott International, Inc., Annual Report (Form 10-K) (Feb. 15, 2018).

35. The PII compromised in the Data Breach are highly valuable. The names, email addresses, telephone numbers, payment card information and expiration dates, passport information, and other valuable PII can all be used to gain access to a variety of existing online accounts and websites.

36. This stolen PII can be used to harm Plaintiff and Class Members through the use of blackmail. The stolen PII can be used to in order to embarrass or harass Plaintiff.

37. The effects of Plaintiff's PII, and subsequently his identity, being stolen has the potential of lasting for years. Identity thieves can wait several years before utilizing stolen PII.

38. When a guest makes a reservation at a Marriott property, Marriott requires that the guest give his or her name, address, email address, payment card number, phone number, and other sensitive private information.

39. According to Marriott's latest Privacy Statement that was last updated on February 4, 2019, Marriott collects a large array of "personal data." This list includes all the above mentioned PII, as well as other personal data such as "[d]ata about family members and companions, such as names and ages of children" and "[p]ersonal [p]references," which includes a guest's hobbies and interests, details about a guest's employer, and many other pieces of very personal information.[8]

40. This data is collected through the following avenues: websites operated by Marriott, social media pages controlled by Marriott, HTML-formatted emails sent by Marriott, "communications with [Marriott]," when guests visit and stay at any Marriott property,

---

[8] *Marriott Group Global Privacy Statement*, MARRIOTT, https://www.marriott.com/about/privacy.mi (last visited Apr. 14, 2019).

or "through other offline interactions."[9]

41. Marriott uses the personal data it collects for its own commercial purposes.

42. In part, with the help of a data analytics company, Marriott uses the personal data collected to more effectively predict and influence its customers' future hotel decisions.

43. Per Marriott's website, Marriott 'will retain your Personal Data for the period necessary to fulfill the purposes outlined in this Privacy Statement . . . ."[10]

44. Marriott admits to sharing customers' personal and "other" data with the following groups and/or people: Marriott Group, Owners and Franchisees, Authorized Licensees, Strategic Business Partners, Service Providers, Linked Accounts and Promotional Activity, eFolio Program, and Corporate Reorganization.[11]

45. Further, Marriott "may use and disclose Other Data for any purpose, except where [it is] not allowed to under applicable law."[12]

46. Marriott claims to use "reasonable organization, technical and administrative measures to protect Personal Data."[13]

47. Further, Marriott admits that "no data transmission or storage system can be guaranteed to be 100% secure."[14]

48. Additionally, Marriott boasts that it is "certified to the EU-U.S. and Swiss-U.S. Privacy Shield framework."[15]

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Marriott Group Global Privacy Statement*, MARRIOTT, https://www.marriott.com/about/privacy.mi (last visited Apr. 14, 2019).
[15] *Id.*

49. According to the Privacy Shield Framework website, "The EU-U.S. and Swiss-U.S. Privacy Shield Frameworks were designed by the U.S. Department of Commerce and the European Commission and Swiss Administration to provide companies on both sides of the Atlantic with a mechanism to comply with data protection requirements when transferring personal data from the European Union and Switzerland to the United States in support of transatlantic commerce."[16]

50. Had Plaintiff known that Marriot would not keep its promise to use "reasonable organization, technical and administrative measures" to keep his PII safe, he would not have stayed at Marriott operated properties.

51. Marriott has a past history of failing to use "reasonable organization, technical and administrative measures" to keep its guests' PII protected and safe.

52. In November of 2015, databases at 54 Starwood were hacked. Although Marriott did not acquire Starwood until 2016, Marriott had identified that a breach had occurred and was therefore on notice of the data security risks associated with the acquisition of Starwood.

53. Starwood announced its data breach and that same week Marriott announced its acquisition plans. Marriott never adequately addressed the problems that led to the data breach within Starwood's database.

54. The malware Starwood discovered on its database that caused the data breach collected guests' payment card information, which included the guests' card numbers, security codes, and expiration dates.

---

[16] PRIVACY SHIELD FRAMEWORK, https://www.privacyshield.gov/welcome (last visited Apr. 14, 2019).

55. Marriott failed to use "reasonable organization, technical and administrative measures" by failing to adequately utilize industry-standard monitoring practices and routine audits which would have revealed Marriott's security inadequacies.

56. On September 8, 2018, Marriott discovered the data breach when a Marriott administrator received an alert from the company's "internal security tool." This is when Marriott learned that someone had attempted to gain access to the Starwood guest reservation database.[17]

57. Marriott claims to have "quickly engaged leading security experts to help determine what occurred." This is when Marriott learned that there had been an ongoing data breach in the Starwood database since 2014.[18]

58. Marriott learned that the hackers had copied and encrypted information. By November 19, 2018, Marriott was finally able to unencrypt that information. This is when it determined that the information was from the Starwood guest reservation database.[19]

59. Marriott's website dedicated to this massive data breach initially stated that "Marriott has not finished identifying duplicate information in the database, but believes it contains information on up to approximately 500 million guests who made a reservation at a Starwood property."[20] Marriott initially said records of up to 500 million guests were involved and in January, 2019 revised its estimate to up to 383 million.[21]

60. Marriott also believes that "[f]or approximately 327 million of these guests, the

---

[17] STARWOOD GUEST RESERVATION DATABASE SECURITY INCIDENT, https://answers.kroll.com (last visited Apr. 14, 2019).
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] https://www.reuters.com/article/us-usa-cyber-congress/marriott-ceo-apologizes-for-data-breach-unsure-if-china-responsible-idUSKCN1QO217

information includes some combination of name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation date, communication preferences, and encrypted payment card numbers."[22]

61. Unfortunately for "some" of those of millions of guests, the stolen PII also included "payment card numbers and payment card expiration dates, but the payment card numbers were encrypted using Advanced Encryption Standard encryption (AES-128)."[23]

62. In order to decrypt those stolen payment card numbers, two components are needed. But, "Marriott has not been able to rule out the possibility that both were taken."[24]

63. Some guests' stolen PII was limited to "name and sometimes other data such as mailing address, email address, or other information."[25]

64. Marriott did not make its initial announcement concerning this massive data breach until November 30, 2018. Marriott allowed eighty-three days to pass from learning that the breach occurred to informing the victims of this crime.

65. The FTC recognizes the need for data security and has established security standards which Marriott has failed to comply with.

66. Marriott violated Section 5 of the FTCA, 15 U.S.C. § 45 through their unfair acts or practices which this code section expressly prohibits.

---

[22] STARWOOD GUEST RESERVATION DATABASE SECURITY INCIDENT, https://answers.kroll.com (last visited Apr. 14, 2019).
[23] *Id.*
[24] STARWOOD GUEST RESERVATION DATABASE SECURITY INCIDENT, https://answers.kroll.com (last visited Apr. 14, 2019).
[25] *Id.*

67. Marriott's failure to use "reasonable organization, technical and administrative measures" to protect its guests from unauthorized access to their PII constitutes an unfair act or practice under 15 U.S.C. § 45.

68. Marriott was aware of its burden to protect its guests' personal data and still failed to take the necessary, required, and appropriate measures to secure and protect its guests' PII, including Plaintiff's PII and that of Class Members.

69. Due to this failure by Marriott, Plaintiff's personal data and personal data of members of the class are in the hands of hackers with impure motives. This requires that Plaintiff and class members take the now necessary step of constantly surveilling their finances and records.

70. Plaintiff and class members did not give Marriott consent to disclose their PII and did not know their PII would be open for hackers to sell on the dark web.

## CLASS ACTION ALLEGATIONS

Under the Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings forth this action on behalf of himself and the nationwide class.

## CLASS ACTION CERTIFICATION REQUIREMENTS

As set forth in the Federal Rules of Civil Procedure 23(a), Plaintiff must establish the following elements to obtain class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) the adequacy of representation.

71. Numerosity[26]: As a result of Defendants' actions, Plaintiff was harmed as a result of a data breach that effected hundreds of millions of people nationwide.[27] From a

---

[26] FED. R. CIV. P. 23(a)(1).
[27] STARWOOD GUEST RESERVATION DATABASE SECURITY INCIDENT, https://answers.kroll.com (last visited Apr. 14, 2019).

geographical standpoint, these individuals are dispersed across the country and are so numerous that joinder of individual claims would be impracticable. Further, the class is ascertainable from the Defendants' internal records that house the identities and contact information of class members.

72. Commonality[28]: Class Members have all incurred the same injury and, thus, they share common questions of law. These common legal and factual questions include, but are not limited to:

a. whether Defendants owed a duty to Plaintiff and members of the Class to protect PII and Payment Card Data;

b. whether Defendants failed to provide reasonable security to protect PII and Payment Card Data;

c. whether Defendants negligently or otherwise improperly allowed PII and Payment Card Data to be accessed by third parties;

d. whether Defendants failed to adequately notify Plaintiff and members of the Class that their data systems had been breached;

e. whether Plaintiff and members of the Class were injured and suffered damages and ascertainable losses;

f. whether Defendants' actions, which failed to reasonably secure Plaintiff's and the Class's PII and Payment Card Data, proximately caused the injuries suffered by Plaintiff and members of the Class;

g. whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

---

[28] FED. R. CIV. P. 23(a)(2).

14

      h. whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

73. Typicality[29]: Plaintiff's claims are typical of the claims of the absent Class Members and has a common origin and basis. Plaintiff and Class Members are all persons and entities injured by Defendants' data breach. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class Members and are based on the same legal theories, namely, the Defendants' data breach. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief.

74. Adequacy[30]: Plaintiff will fully and adequately assert and protect the interests of the absent Class Members and has retained Class counsel who have considerable experience in class action litigation concerning corporate data security and the resources necessary to prosecute this case. Neither Plaintiff nor his attorneys have any interests contrary to or conflicting with the interests of absent Class Members.

## THE RULE 23(B)(3) FACTORS

75. The questions of law and fact common to all Class Members predominate over any questions affecting only individual Class Members.

76. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class Members' claims is economically infeasible and procedurally impracticable. Class Members share the same factual and legal issues and litigating the claims together will prevent varying,

---

[29] FED. R. CIV. P. 23(a)(3).
[30] FED. R. CIV. P. 23(a)(4).

inconsistent, or contradictory judgments and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class Members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

77. Contact information for each Class Member, including mailing addresses, is readily available, facilitating notice of the pendency of this action.

## COUNT I: NEGLIGENCE

### (Brought by Plaintiff and the Nationwide Class)

78. By reference, Plaintiff incorporates all of the above allegations as full set forth herein.

79. Upon accepting Plaintiff's and Class members' PII and Payment Card Data and storing it in its computer database, Defendants assumed a common law duty to exercise reasonable care and diligence to protect information that Defendants acknowledged was private and confidential.

80. As a result of other highly publicized data breaches, Defendants knew or should have known that they were a target of unauthorized third-party interference and that they had an obligation to protect Plaintiff and Class Members' PII and Payment Card Data.

81. Accordingly, Defendants had a common law duty to prevent the foreseeable harm from failing to protect the PII and Payment Card Data of Plaintiff and Class Members because Plaintiff and the Class Members were the foreseeable and probable victims of inadequate security practices.   Defendants collected and stored personal and confidential information of Plaintiff and Class Members and have acknowledged that this information needed to be secure; it was foreseeable that Plaintiff and Class

16

Members would be harmed if Defendants did not protect Plaintiff's and Class Members' information from hackers.

82. Defendants have a statutorily imposed duty under Section 5 of the Federal Trade Commission Act[31] ("FTCA"), which prohibits "unfair . . . practices in or affecting commerce;" including, as interpreted by the FTC, the unfair practice of failing to use reasonable measures to protect the PII and Payment Card Data of individuals. Moreover, several states have enacted similar statutes based on the FTCA which has further created a duty for Defendants.

83. Under common law and statutory law, Defendants have breached their duties to exercise reasonable security practices in the storage of data, implement measures to detect the breach while it was ongoing, maintain industry standard security systems to protect Plaintiff's and Class Members' PII and Payment Card Data, and implement adequate security systems to protect Plaintiff and Class Members' personal and confidential information.

84. The failure of Defendants to take proper security measures to protect Plaintiff's and Class Members' PII and Payment Card Data has caused Plaintiff and Class Members to suffer injury and damages. Defendants recognized this by offering Plaintiff and Class Members a one-year membership to the credit monitoring agency WebWatcher.

85. As described herein, Plaintiff's information and that of the Class Members have been compromised and they have suffered injury and, as a result, they must now take affirmative steps to ensure that their respective identities are not stolen, and financial information is not compromised.

---

[31] 15 U.S.C. § 45 (2006).

86. By failing to notify Plaintiff and Class Members of the data breach, Defendants have compounded the risk of damages by preventing Plaintiff and Class Members from taking steps to secure their financial data.

87. As a direct and proximate cause of Defendants' negligence in failing to adequately protect Plaintiff's and Class Members' PII and Payment Card Data, Plaintiff and Class Members have suffered, and will continue to suffer harm. Plaintiff and Class Members must now take affirmative actions to safeguard themselves from Defendants' negligence.

88. As a result of Defendants' negligent actions, Plaintiff and Class Members are, therefore, entitled to compensatory, punitive, and nominal damages in an amount to be later proven/determined at trial.

## COUNT II: NEGLIGENCE PER SE
### (Brought by Plaintiff and the Nationwide Class)

89. By reference, Plaintiff incorporates all of the above allegations as full set forth herein.

90. Section 5 of the FTCA prohibits, among other things, "unfair . . . practices in or affecting commerce." The FTC has interpreted and enforced these actions and interpreted these actions to include the failure of businesses, such as the Defendants, to reasonably protect the PII and Payment Card Data of individuals. Moreover, a separate duty also arises from the codification of statutes similar to the FTCA across the country that protects consumers from the negligent actions of businesses in protecting their PII and Payment Card Data. Defendants have failed to take reasonable measures to protect the PII and Payment Card Data of Plaintiff and Class Members. Moreover, Defendants failed to use reasonable measures to protect the PII and Payment Card Data of Plaintiff and Class

18

Members by failing to comply with industry standards. Defendants are in violation of Section 5 of the FTCA and, thus, its actions constitute negligence *per se.*

91. Section 5 of the FTCA, and other similar state statutes, are designed to protect classes of individuals such as Plaintiff and the Class Members. Moreover, the statutes are further designed to prevent the type of harm that occurred to Plaintiff and Class Members.

92. Plaintiff and Class Members have suffered and continue to suffer injury by having to take affirmative actions to protect and monitor their identities as a direct and proximate result of Defendants' negligence *per se.*

93. As a result of Defendants' conduct, Plaintiff and Class Members are entitled compensatory, punitive, and nominal damages, in an amount to be proven/determined at trial.

## COUNT III: IMPLIED BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Nationwide Class)

94. By reference, Plaintiff incorporates all of the above allegations as full set forth herein.

95. Defendants required Plaintiff and Class Members to provide PII and Payment Card Data in order to book a hotel room and, thus, Defendants entered into implied contracts with Plaintiff and Class Members, whereby Defendants were obligated under the covenant of good faith and fair dealing to adequately safeguard Plaintiff's and Class Members' PII and Payment Card Data and promptly detect any data breach of Plaintiff's and Class Members' PII and Payment Card Data in a timely fashion and timely notify them of any unauthorized access to that information.

96. Defendants agreed to protect guests' PII and Payment Card Data and limit its use of the information and, thus, ensured Plaintiff and Class Members that their PII and Payment Card Data would be safeguarded.

19

97. Plaintiff and Class Members accepted these offers made by Defendants when they allowed Defendants to store, maintain, and safeguard their PII and Payment Card Data with the understanding that such information would not be disclosed or disseminated to the public or any unauthorized third parties.

98. Defendants also solicited Plaintiff and Class Members to join its Loyalty Program, which required Plaintiff and Class Members to provide their personal information such as dates of birth, passport numbers, credit and debit card numbers and other payment data, employer details, location information and other confidential information.

99. Defendants encouraged Plaintiffs and Class Members to use the Loyalty Program to make reservations. Plaintiff and Class Members accepted offers made by Defendants in connection with use of the Loyalty Program, continuing to allow Defendants to store, maintain and safeguard their personal, confidential information.

100.    Accordingly, Plaintiff and Class Members would not have provided their personal, confidential information to Defendants in connection with staying in a property owned by Defendants in the absence of the implied contract between the parties.

101.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

102.    Defendants breached the agreements by failing to adequately safeguard Plaintiff's and Class Members' personal information. Moreover, the Defendants have breached the agreements by failing to detect the data breach and by failing to notify Plaintiff and Class Members of the data breach in a timely fashion.

103.    As a direct and proximate result of Defendants' breaches of the implied contracts between Defendants and Plaintiff and Class Members, Plaintiff and Class Members

sustained actual losses and damages and are entitled to compensatory, punitive, and nominal damages, in an amount to be proven/determined at trial.

### COUNT IV: UNJUST ENRICHMENT
#### (Brought by Plaintiffs and the Nationwide Class)

104.    By reference, Plaintiff incorporates all of the above allegations as full set forth herein.

105.    In the alternative, Plaintiff alleges that he and Class Members have no adequate remedy at law.

106.    Plaintiffs and Class Members conferred benefits on Defendants when they paid for fees to Defendants for accommodations and services.  Plaintiff and Class Members provided their PII and Payment Card Data to Defendants and expected that Defendants would protect that information.

107.    Defendants knowingly and willingly accepted monetary benefits for their accommodations from Plaintiff and Class Members, but failed to honor their obligations to Plaintiff and Class Members, including protecting their PII and Payment Card Data.

108.    It is inequitable for Defendants to retain the monetary benefits they received at the expense of Plaintiff and Class Members.  Payments made by Plaintiff and Class members should have been used by Defendants to pay for costs of adequate data privacy and security practices and procedures.

109.    By engaging in the conduct described herein, Plaintiff and Class Members have suffered actual damages for Defendants' failure to employ adequate data privacy and security practices and procedures.

110.    Defendants have been unjustly enriched at the expense of Plaintiff and Class Members.  Under the circumstances, it would be contrary to equity and good conscience

21

to permit Defendants to retain the ill-gotten gain that they received in light of the violations of law described above.

111.    Plaintiff and Class Members have suffered injury as a result of Defendants' unjust enrichment and are entitled to reimbursement, restitution and disgorgement by Defendants of the monetary benefit conferred upon them by Plaintiff and Class Members.

## COUNT V: DECLARATORY AND EQUITABLE RELIEF
### (Brought by Plaintiffs and the Nationwide Class)

112.    By reference, Plaintiff incorporates all of the above allegations as full set forth herein.

113.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and, therefore, grant further necessary relief. Moreover, the Court has broad authority to restrain acts, such as the actions of the Defendants described herein, which are tortious and violate the terms of federal and state statutes.

114.    Under the Declaratory Judgment Act, this Court has the authority to enter a judgment declaring, among other things, the following:

   a.  Defendants continue to owe a legal duty to secure their guests' PII and Payment Card Data, specifically including information relating to PII and Payment Card Data used by Defendants' guests;

   b.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure their guests' PII and Payment Card Information; and

   c.  Defendants' ongoing breaches of their legal duty continue to cause Plaintiff and the Class harm.

22

115.  The Court also should issue corresponding injunctive relief requiring Defendants to employ adequate security protocols, consistent with industry standards, to protect PII and Payment Card Data. Specifically, this injunction should, among other things, direct Defendants to:

a.  utilize industry standard encryption to encrypt the transmission of cardholder data at all times;

b.  implement encryption keys in accordance with industry standards;

c.  implement EMV technology;

d.  engage third-party auditors, consistent with industry standards, to test systems for weaknesses and upgrade any such weakness found;

e.  audit, test, and train data security personnel regarding any new or modified procedures, and how to respond to a data breach;

f.  regularly test systems for security vulnerabilities, consistent with industry standards;

g.  comply with all PCI-DSS standards pertaining to the security of guests' PII and Payment Card Data; and

h.  install all upgrades recommended by manufacturers of security software and firewalls used by Defendants.

116.  If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach. The risk of another such breach is real, immediate, and substantial. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced

23

to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for out-of-pocket damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable and reputational damage.

117.    The hardship to Plaintiff and the Class, if an injunction is not issued, exceeds the hardship to Defendants, if an injunction is issued. Among other things, if another massive data breach occurs with Defendants' data systems, Plaintiff and members of the Class will likely incur tens of millions of dollars in damages. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

118.    The issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another breach of Defendants' data systems, thus eliminating the injuries that would result to Plaintiff, the Class, and the millions of consumers whose confidential information would be compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

A. Certify the Nationwide Class and appoint Plaintiff and Plaintiff's counsel to represent the Class;

B. Finding that Defendants' conduct was negligent, deceptive, unfair and unlawful;

C. Enter a monetary judgment in favor of Plaintiff and the Class to compensate them for injuries they have suffered, together with pre-judgement and post-judgement interest and treble damages and penalties where appropriate;

D. Enter a declaratory judgement as described herein;

E. Grant the injunctive relief requested herein;

F. Award Plaintiff and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and

G. Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all claims in this action.

Respectfully submitted this 16th day of April 2019

THE FINLEY FIRM, P.C.

J. BENJAMIN FINLEY (FIN005)
bfinley@thefinleyfirm.com

200 13th Street
Columbus, GA  31901
T: 706-322-6226 | F: 706-322-6221

3535 Piedmont Road
Building 14, Suite 230
Atlanta, GA  30305
T:  404-320-9979 | F: 404-320-9978

MARYBETH V. GIBSON
*Pro Hac Vice Pending*
mgibson@thefinleyfirm.com

*Counsel for Plaintiff*